Yvonna NISWANGER, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–94–023–CR.

Court of Appeals of Texas,
Waco.

May 11, 1994.

Robert T. Swanton, Jr., Goble & Swanton, Waco, for appellant.

John W. Segrest, Criminal Dist. Atty., E. Alan Bennett, Ass't Dist. Atty., Waco, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Yvonna Niswanger appeals the court's finding that she continued to meet the criteria for extended mental health services. *See* TEX.HEALTH & SAFETY CODE ANN. § 574.066 (Vernon 1992). The court determined that she required extended mental health services and that Austin State Hospital was the least restrictive appropriate setting for those services. *See id.* §§ 574.035, 574.036(d) (Vernon 1992). Niswanger brings nine points, each challenging the sufficiency of the evidence to support the court's order. We will affirm.

Niswanger shot and killed her husband Billy on February 21, 1992. A jury found her incompetent to stand trial, and she was committed to Vernon State Hospital until she regained her competency. Niswanger regained her competency and, on October 8, 1992, was found not guilty by reason of insanity. The court committed her to Vernon State Hospital under article 46.03, section 4(d), of the Code of Criminal Procedure. *See* TEX.CODE CRIM.PROC.ANN. art. 46.03, § 4(d) (Vernon Supp.1994). In February 1993, the court found that Niswanger met the requirements for court-ordered extended mental

health services and committed her to the Austin State Hospital for a period not to exceed twelve months.

On January 28, 1994, the court held a hearing to determine whether Niswanger continued to meet the criteria for involuntary commitment and court-ordered extended mental health services and made the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Yvonna Niswanger is mentally ill.
2. As a result of that mental illness, Yvonna Niswanger will, if not treated, continue to suffer severe and abnormal mental, emotional, and physical distress, will continue to experience deterioration of her ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment.
3. The condition of Yvonna Niswanger is expected to continue for more that 90 days.
4. Yvonna Niswanger has already been subject to an order for extended mental health services.
5. If Yvonna Niswanger is released from Austin State Hospital, she poses a danger to herself, her daughter and son-in-law, and her grandchildren.

## CONCLUSIONS OF LAW

1. Yvonna Niswanger requires court-ordered extended mental health services.
2. The least restrictive appropriate setting in which Yvonna Niswanger can receive court-ordered extended mental health services is Austin State Hospital.

## MENTAL HEALTH CODE

In a proceeding to determine whether a person requires court-ordered extended mental health services, the finder of fact must find from clear and convincing evidence that:

1. the proposed patient is mentally ill;
2. as a likely result of that mental illness the proposed patient:

    (A) is likely to cause serious harm to himself;

    (B) is likely to cause serious harm to others; or

    (C) will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, will continue to experience deterioration of his ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment;

3. the proposed patient's condition is expected to continue for more than 90 days; and
4. the proposed patient has received court-ordered inpatient mental health services under this subtitle or under Section 5, Article 46.02, Code of Criminal Procedure, for at least 60 consecutive days during the preceding 12 months.

TEX.HEALTH & SAFETY CODE ANN. § 574.-035(a).

## STANDARD OF REVIEW

*no-evidence points*

When the complaining party raises a "no-evidence" point[1] challenging the legal sufficiency of the evidence to support a finding that favors the party who had the burden of proof on that finding, the reviewing court must sustain the finding if, considering only that evidence and the inferences which support the finding in the light most favorable to the finding and disregarding evidence and inferences to the contrary, any probative evidence supports it. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspi-

---

1. We use the terminology suggested in William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 517–19 (1991); *see also Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275–76 (Tex.App.—Amarillo 1988, writ denied).

cion of [the fact's] existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex. 1992). A no-evidence point can only be sustained when the record reveals one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or rules of evidence bar us from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

■ If a "no evidence" point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

*insufficient-evidence points*

■ In reviewing an "insufficient-evidence" point[2] challenging the factual sufficiency of the evidence to support a finding that favors the party who had the burden of proof on that finding, the reviewing court may set aside the finding only if a review of all the evidence, both for and against the finding, demonstrates that the finding is clearly wrong and manifestly unjust. *Id.* Reversal could occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 519 n. 11 (1991).

*court-ordered extended mental health services*

■ To subject a patient to court-ordered extended mental health services, the evidence must be "clear and convincing." TEX. HEALTH & SAFETY CODE ANN. § 574.035(a). To be clear and convincing under this section, "the evidence must include expert testimony and evidence of a recent overt act *or* a continuing pattern of behavior that *tends to confirm* the likelihood of serious harm to the proposed patient or others or the proposed patient's distress and the deterioration of ability to function." *Id.* § 574.035(d) (emphasis added). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction about the truth of the allegations sought to be established. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979). The proof must be more than merely the greater weight of the credible evidence, but there is no requirement that the evidence be unequivocal or undisputed. *Sims v. State,* 816 S.W.2d 502, 505 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

## THE EVIDENCE

STATE'S WITNESSES

Dr. Stephen Mark, a psychiatrist appointed by the court as a disinterested expert and called by the State, testified that he had examined Niswanger most recently on January 21, 1994—approximately one week prior to the hearing. Prior to that examination, Mark had seen Niswanger in May 1992. He testified that he did not know of any recent overt acts or patterns of behavior that led him to believe that Niswanger was dangerous to herself or others or that caused him to believe that she would continue to experience deterioration of her ability to function.

Mark also testified that part of the reason Niswanger is not a danger to herself is because of the restrictive setting of the Austin State Hospital. Much of Mark's opinion depended on Niswanger's receiving continuing treatment of a monthly injection of Haldol:

[STATE]: Do you believe, Doctor, that she will, if she does not continue to receive treatment, continue to suffer severe and abnormal mental and emotional or physical distress?

[MARK]: Yes.

[STATE]: Do you believe that she will continue to experience deterioration of her ability to function independently?

[MARK]: Yes.

2. See footnote 1.

[STATE]: And do you believe that she is currently unable to make a rational and informed decision as to whether or not to submit to treatment for her condition?

[MARK]: That's hard to answer. I think she understands the need for medication and treatment. But within that realm, she still has a serious psychiatric illness.

[STATE]: Are you familiar with her background in not being consistent in taking her medication?

[MARK]: Yes.

[STATE]: Is that a common problem with this particular illness?

[MARK]: Yes.

. . . . .

[STATE]: Dr. Mark, do you believe based on you opinion that if Yvonna Niswanger did not take medication prescribed for her that she would become a danger to herself?

[MARK]: Yes.

[STATE]: And that she would have become a danger to others?

[MARK]: Yes.

Mark went on to describe the type of treatment typically provided in a halfway house. On cross-examination, he testified that Niswanger was an appropriate candidate for a halfway house. The integral supposition in Mark's testimony was that *as long as Niswanger maintained her medication* she would not be dangerous to herself or others nor would she continue to deteriorate.

Pam Wood, Niswanger's daughter, testified that Niswanger had called her shortly before the hearing and had been "a little upset or maybe even angry with me because she wanted me to allow her to get out of jail or out of the hospital." Niswanger was also "a little upset" with some of her dead husband's family members because they had been at prior court hearings.

Niswanger had written two letters to Wood that were introduced at the hearing. Exhibit No. 1 was a letter from September 1993 in which Niswanger was "plenty mad" at her husband's brother, Chuck, for "lying" about borrowing money from her husband. She called Chuck "a big liar." In Exhibit

No. 2, a letter from October 1993, Niswanger asked Wood to "check my electric blanket and your daddy's electric blanket to see if I turned them off." Wood testified that Niswanger had not been back to her home since February 1992.

Wood recalled that while she was growing up, her mother was in and out of psychiatric hospitals. Niswanger would be on medication while hospitalized, but once home, would only remain on medication for a short time. Wood recalled Niswanger receiving monthly injections from a psychiatrist to control her schizophrenia. However, after two or three injections, Niswanger "decided not to go back, and did not continue those any longer." Wood testified that she saw no reason to believe that, given her mother's prior history of discontinuing medication once released from a hospital, Niswanger would do any differently now.

On cross-examination, Wood testified that she was angry at her mother for killing her father. She stated that she had not replied to any of her mother's letters, nor had she ever called her mother in Austin. Wood had retained a lawyer to pursue a wrongful death claim against Niswanger. A letter from Wood's attorney seeking to settle the proposed suit was introduced into evidence.

DEFENSE WITNESS

Dr. Larry Hawkins, a psychiatrist at the Austin State Hospital, testified that he had been treating Niswanger since April 1993. He described her treatment as consisting of anti-psychotic medications—injectable Haldol and Cogentin for the side effects of the Haldol—and activity and group therapy. Niswanger also took high blood pressure medications and was on a diabetic low-cholesterol diet.

Hawkins testified that, in his opinion, Niswanger could be treated on an out-patient basis. Hawkins believed that, as long as Niswanger maintained her monthly injection of Haldol, she would not pose a threat to herself or others and would not experience any deterioration in her ability to function independently.

By a letter to the court in May 1993, Hawkins had stated that Niswanger's condi-

tion was stable enough to consider releasing her from the hospital. Hawkins recommended an "Outpatient Commitment in order to ensure compliance with medications as an outpatient." He recommended an MHMR halfway house in Waco. Hawkins testified that ultimately Niswanger would be able to live in an apartment on her own, but presently she needed supervision in the community. He testified that he knew of no recent overt acts or continuing pattern of behavior that would cause him to believe she would be a danger to herself or others.

## SUFFICIENCY OF THE EVIDENCE

Niswanger concedes that, as a chronic paranoid schizophrenic, she is "mentally ill" as required by section 574.035(a)(1). However, she argues that the State failed to prove by clear and convincing evidence the remaining elements necessary to order extended mental health services. Specifically, Niswanger complains in points one through three that there is no evidence or insufficient evidence to support Findings of Fact Nos. 2, 3, and 5. In point four, she complains that there is no evidence or insufficient evidence to support the court's order under the requirements of section 574.035(a)(2)(A)–(C) of the Health and Safety Code. Points five and six attack Conclusion of Law No. 1.

■ Point one challenges the court's finding that Niswanger "will, if not treated, continue to suffer severe and abnormal mental, emotional, and physical distress, will continue to experience deterioration of her ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment."

To be clear and convincing under section 574.035, "the evidence must include expert testimony *and* evidence of a recent overt act or a continuing pattern of behavior that *tends to confirm* the likelihood of serious harm to the proposed patient or others or the proposed patient's distress and the deterioration of ability to function." TEX.HEALTH & SAFETY CODE ANN. § 574.035(d) (emphasis added). The key language in subsection (C) of section 574.035(a)(2) is whether the patient will continue to suffer distress and deterioration "if not treated." *L.S. v. State*, 867 S.W.2d 838, 842 (Tex.App.—Austin 1993, n.w.h.). The court can consider the consequences of removing Niswanger from the safety of a structured environment in the hospital. *See id.*

Unquestionably, *if not treated*, Niswanger would suffer severe and abnormal mental, emotional and physical distress, would experience deterioration of her ability to function independently, and would be unable to make rational and informed decisions as to whether to submit to treatment. Both Mark and Hawkins testified that Niswanger must receive consistent, monthly injections of Haldol. Mark testified that, if Niswanger did not take her medication, she would become a danger to herself and others. Wood testified that her mother had a history of choosing not to take her medication. Mark testified that he was familiar with Niswanger's history of not taking her medication. Presumably Niswanger murdered her husband during a period when she was off of her medication and delusional. We believe that the evidence, taken in total, "tends to confirm" the likelihood of serious harm to Niswanger or others or her distress and the deterioration of her ability to function—thus meeting the requirement of clear and convincing evidence. *See* TEX.HEALTH & SAFETY CODE ANN. § 574.-035(d).

Furthermore, neither doctor recommended releasing Niswanger from court-ordered extended mental health services. Rather, their testimony as to whether she should be placed in a halfway house assumed that Niswanger would continue under an order of extended mental health services, but in a lesser-restricted facility.

Reviewing only the evidence in support of the court's finding, we find the evidence legally sufficient to sustain Finding of Fact No. 2. *See Reyna*, 865 S.W.2d at 928. Our review of the entire record does not convince us that the evidence is so weak as to be clearly wrong or manifestly unjust. *See Garza*, 395 S.W.2d at 823. We overrule point one.

■ In her second point, Niswanger challenges the finding that her condition is expected to continue for more than 90 days.

Niswanger concedes that her condition as a chronic paranoid schizophrenic is expected to continue for more than 90 days. However, she challenges the finding to the extent that this mental condition meets the requirements of section 574.035(a)(2)(A)–(C). Mark testified that Niswanger's "condition" was indefinite, incurable, and would continue for more than 90 days. We find the evidence legally and factually sufficient to support the court's Finding of Fact No. 3. We overrule point two.

■ Point three challenges the finding that Niswanger, if released from the Austin State Hospital, will pose a danger to her daughter, son-in-law, and grandchildren. The State concedes that there is not clear and convincing evidence to support the court's finding of "dangerous" under section 574.035(a)(2)(A) or (B). However, the State argues that the "dangerous" finding goes to the question of the "least restrictive appropriate setting available." *See* TEX.HEALTH & SAFETY CODE ANN. § 574.036(d). The "least restrictive" setting determination is reviewed by an abuse of discretion standard. *See Sims v. State*, 816 S.W.2d 502, 508 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

■ In point four, Niswanger complains that the evidence is legally and factually insufficient to justify the order for extended mental health services pursuant to the requirements of section 574.035(a). In points five and six, she complains the evidence is legally and factually insufficient to support the court's Conclusion of Law No. 1—that Niswanger requires court-ordered extended mental health services.

We have determined in point one that there is sufficient clear and convincing evidence that Niswanger, *if not treated,* will meet the criteria of section 574.035(a)(2)(C). In point two, we have determined that there is sufficient clear and convincing evidence that her condition is expected to continue for more than 90 days. Niswanger concedes that she is mentally ill. Thus, the court did not err in entering its order for extended mental health services. *See* TEX.HEALTH & SAFETY CODE ANN. § 574.035(a). We overrule points four, five and six.

## ABUSE OF DISCRETION

■ In points seven and eight, Niswanger complains that the evidence is legally and factually insufficient to support the court's Conclusion of Law No. 2—that "the least restrictive appropriate setting in which Yvonna Niswanger can receive extended mental health services is Austin State Hospital." In point nine, she complains that the evidence is legally and factually insufficient to justify the court's order pursuant to sections 574.036(d) and 571.004 of the Health and Safety Code. Although Niswanger phrases her complaints in terms of sufficiency, her argument states that the standard of review is whether the trial court's act is so arbitrary and unreasonable as to amount to an abuse of discretion. *See Sims,* 816 S.W.2d at 508. We agree and will review the court's acts by an abuse-of-discretion standard.

■ Abuse of discretion implies more than an error in judgment; it must amount to an arbitrary and unreasonable action by the trial court. *Id.* A court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992) (orig. proceeding). Thus, with respect to the resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court. *Id.* Niswanger must establish that the trial court could reasonably have reached only one decision. *See id.* at 840. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Id.*

Court-ordered extended mental health services must be provided "in the least restrictive appropriate setting available." TEX. HEALTH & SAFETY CODE ANN. § 574.036(d). The court may order inpatient or outpatient care. *Id.* § 574.036(e) (Vernon 1992). The "least restrictive appropriate setting" is the treatment setting that:

1. is available;

2.  provides the patient with the greatest probability of improvement or cure; and

3.  is no more restrictive of the patient's physical or social liberties than is necessary to provide the patient with the most effective treatment and to protect adequately against any danger the patient poses to himself and others.

*Id.* § 571.004 (Vernon 1992).

Both doctors testified that Niswanger was an appropriate candidate for a halfway house. Mark testified that, as long as Niswanger was receiving Haldol, she would not be a danger if she were able to come and go from a halfway house and go freely in the community. Hawkins testified that Niswanger needed to be "in a halfway house setting where she can reintegrate herself in handling herself in the community, and needs to do that with supervision." He testified that, if Niswanger were committed to the Austin State Hospital for a number of years, she might actually lose some of her ability to take care of herself independently.

Niswanger's stability is completely dependent on her receiving monthly Haldol injections. Mark testified that, without medication, Niswanger would become a danger to herself and others. He testified that he was aware of Niswanger's history of not being consistent in taking her medication and that not taking the required medication is a common problem with chronic paranoid schizophrenics.

Both doctors testified about the structure and level of supervision Niswanger might receive in a halfway house. Mark testified that, if placed in a halfway house, Niswanger would continue to receive care from a mental health worker and that someone in the halfway house would make sure she continued to take her medication. He also stated that, if Niswanger failed to report for her monthly shot, this failure could be reported to the court for the judge to take appropriate action.

Hawkins testified to the effects of a schizophrenic, such as Niswanger, missing a monthly injection. If she missed an injection, the medication would begin to wear off

and she would gradually begin to experience "deterioration" of her condition. "Deterioration" varies from two days, to a week, to six weeks. Hawkins agreed that, as an outpatient, Niswanger would have to be responsible and cooperate in her treatment. Hawkins was uncertain as to the procedure for notifying the court if a patient missed an appointment and could not be located by a case manager.

Wood testified that, while she was growing up, her mother would be on medication while hospitalized, but once home, would only remain on medication for a short time. Wood recalled Niswanger receiving monthly injections from a psychiatrist to control her schizophrenia. However, after two or three injections, Niswanger chose to discontinue the treatment. Wood testified that she saw no reason to believe that, given her mother's prior history of discontinuing medication once released from a hospital, Niswanger would do any differently in the present.

Wood further testified that, if her mother were allowed to go to a halfway house, "I would be scared for my children's lives, for my husband's life, mine. If she did this once, you know, then in my own mind I think it's a possibility it could happen again." Wood recounted a phone conversation with Niswanger in which she had said that killing her husband "was the only way out of the marriage. And if that's the only way she knows how to solve a problem and I feel like she's angry toward me, then I would think that's the way she would try to solve a problem with us." On cross-examination, Wood testified, however, that Niswanger had not threatened her or expressed any anger directly towards her.

Testing the court's determination against the abuse-of-discretion standard, we do not find that the court's order was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *See Walker,* 827 S.W.2d at 839–40. We overrule points three, seven, eight, and nine.

We affirm the judgment.