In The


 Court of Appeals


 Ninth District of Texas at Beaumont


 ____________________


 NO. 09-04-026 CR

 ____________________


 MILLET HARRISON, JR., Appellant


 V.


 THE STATE OF TEXAS, Appellee




 On Appeal from the 252nd District Court

 Jefferson County, Texas

 Trial Cause No. 66306




 O P I N I O N

 Millet Harrison, Jr. brings this appeal from an order extending inpatient mental
health services for another twelve months. Harrison was found not guilty of murder by
reason of insanity on October 21, 1994. See Act of May 25, 1983, 68th Leg., R.S., ch.
454, § 2, 1983 Tex. Gen. Laws 2640 (amended 1989, 2001, 2003) (current version at
Tex. Code Crim. Proc. Ann. art. 46.03 (Vernon Supp. 2004)). (1) Initially, he was
transferred to Vernon State Hospital for treatment. See Harrison v. State, No. 09-98-134-CR, 1999 WL 160825 (Tex. App.--Beaumont Mar. 24, 1999, no pet.) (not designated for
publication). Subsequently, Harrison was transferred to Rusk State Hospital. See
Harrison v. State, No. 07-99-0259-CR, 1999 WL 994378 (Tex. App.--Amarillo Nov. 2,
1999, no pet.) (not designated for publication). This appeal is brought challenging the
trial court's most recent order of December 10, 2003, for extended inpatient mental health
services.

 Harrison raises three issues. In his first two issues, Harrison contends the evidence
is legally and factually insufficient to support the trial court's finding that he continues to
meet the criteria for court-ordered inpatient mental health services. 

 Section 4(d)(5) of article 46.03 provides that a person acquitted by reason of
insanity and committed to a mental hospital or other appropriate facility may only be
discharged in accordance with the procedures specified therein and charges the trial court
with determining whether the acquitted person continues to meet the criteria for
involuntary commitment. Section 4(d)(2) provides that criteria is found in the Texas
Mental Health Code. See Tex. Health & Safety Code Ann. §§ 574.031-.037 (Vernon
2003 & Supp. 2004). As noted in Campbell v. State, 118 S.W.3d 788, 793 (Tex. App.--Houston [14th Dist.] 2003, pet. denied), "[T]he court can only recommit appellant if it
finds that he meets one of the criteria for commitment specified in Mental Health Code
section 574.035." Accord Roland v. State, 989 S.W.2d 797, 798 (Tex. App.--Fort Worth
1999, no pet.); Niswanger v. State, 875 S.W.2d 796, 799 (Tex. App.--Waco 1994, no
writ); and In the Interest of G.B.R., 953 S.W.2d 391, 394 (Tex. App.--El Paso 1997, no
writ).

 Section 574.035(a) sets forth the criteria for court-ordered extended inpatient
services. See Act of May 22, 1997, 75th Leg., R.S., ch. 744, §6, 1997 Tex. Gen. Laws
2409 (amended 1999, 2003) (current version at Tex. Health & Safety Code Ann. §
574.035 (Vernon Supp. 2004)). (2) Clear and convincing evidence the criteria has been met
is required to support such an order. "To be clear and convincing under Subsection (a),
the evidence must include expert testimony and evidence of a recent overt act or a
continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to
the proposed patient or others; or (2) the proposed patient's distress and the deterioration
of the proposed patient's ability to function." Tex. Health & Safety Code Ann. §
574.035(e) (Vernon Supp. 2004).

 Clear and convincing evidence is that measure or degree of proof that will produce
in the mind of the trier of fact a firm belief or conviction about the truth of the allegations
sought to be established. See State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979). In a
case where the burden of proof at trial was by clear and convincing evidence, we review a
challenge to the legal sufficiency of the evidence by considering all the evidence in the
light most favorable to the finding. See In re S.T., 127 S.W.3d 371, 373 (Tex. App.--
Beaumont 2004, no pet.) (citing In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002)). We must
assume the factfinder resolved disputed facts in favor of the finding, if a reasonable
factfinder could do so. Id. Further, we disregard all evidence that a reasonable factfinder
could have disbelieved or found incredible, but undisputed facts that do not support the
finding cannot be disregarded. Id.

 In a challenge to the factual sufficiency of the evidence, we must give due
consideration to any evidence the factfinder could reasonably have found to be clear and
convincing. Id. The evidence is factually insufficient if, in light of the entire record, the
disputed evidence that does not support the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction. Id. 

 The record reflects Harrison has received court-ordered inpatient mental health
services since 1994. Dr. David Self diagnosed Harrison's illness as paranoid
schizophrenia. Dr. Edward Gripon testified Harrison's illness is not considered
"curable," but treatable. Dr. Self and Dr. Gripon agreed that Harrison needs to continue
taking medication. 

 Dr. Self testified there have never been any problems with Harrison. In reviewing
all of Harrison's records, Dr. Self found he has been consistently cooperative and
compliant. Harrison's illness is in full remission and there is no evidence of symptoms. 
Dr. Self testified he could see Harrison living safely in the community and would have no
problem with Harrison living next door to him. 

 Dr. Gripon testified there has been no evidence of psychotic symptoms for a
number of years. Dr. Gripon had reviewed Harrison's records from the last year and had
not noticed any evidence of aggressive or assaultive behavior. In all of his interviews and
interactions with Harrison, Dr. Gripon had never noticed any assaultive or aggressive
behavior. The only violent behavior was the instant offense during a period of severe
decompensation. According to Dr. Gripon, "[O]nce [Harrison] was in jail and initially
even treated there was nonviolent behavior. And there's been no violent behavior over
the ten years that I'm aware of." Dr. Gripon said he would feel safe if Harrison were
living next to him and he was not afraid of Harrison. According to Dr. Gripon, Harrison
is in a state of remission and would be expected to remain in that state so long as he
complied with reasonable treatment recommendations. Dr. Gripon would not say a
complete failure of treatment could not happen suddenly, "but it would not happen very
often and it wouldn't happen in this case because of his sensitivity and response to
treatment that's already been demonstrated for 30 years." Dr. Gripon was asked about the
possibility of Harrison committing acts similar to the one in 1994 if he lost "the chemical
sanity he's currently under." Dr. Gripon stated Harrison would probably experience some
symptoms of illness but could not answer whether it would manifest itself in any type of
violent act. 

 Robert Cheshire, a clinical social worker at Rusk for approximately two years, has
been Harrison's social worker for the last year. Over the past year, Harrison has been
stable and not shown any signs or symptoms of psychosis or relapse. There have been no
disciplinary problems and no problems with compliance. Harrison is compliant with his
whole treatment and continues to attend classes, even though he has taken them all
before. Harrison patiently goes through the discussions that have to be done with each
patient, and continues to offer insight into the questions and discussions. 

 There is no evidence Harrison is, in his present condition, likely to cause serious
harm to others. However, as Dr. Gripon testified, Harrison's current condition requires
the continued administration of medication and his improvement is, at least in part, and
probably in large measure, based upon the effect of the medication. Dr. Gripon stated,
"[A]nd that has been referred to by other people, other than just me, as chemical sanity or
chemical mental health because it adjusts some type of chemical substrates in the central
nervous system and that's what corrects the problem." If Harrison were to avoid taking
antipsychotic medication, there would be the potential, and even the probability, that his
mental state would deteriorate. Dr. Gripon could not answer whether it would manifest in
any type of violent act.

 Dr. Self also testified as to what would happen if Harrison were to stop taking his
medication. Typically, he stated, the deterioration begins with very vague things such as
a disturbance in sleep, becoming more preoccupied with his own internal thoughts, the
emergence of suspicion and paranoid thinking that would evolve into full-blown delusion. 
 According to Dr. Self, in Harrison's case, "Hallucinations are a very, very late
occurrence in his exacerbating episodes; and that would come weeks out," along with
disordered behavior. 

 Dr. Self testified that Harrison has always been voluntarily compliant as regards
taking his medication. The one exception to Harrison not being on an effective
medication regimen was at the instruction of Harrison's psychiatrist at the time. Dr. Self
presumed that because of Harrison's complete response to medication, the psychiatrist did
not think Harrison needed medication so he advised Harrison to stop taking it. That was
when Harrison deteriorated into psychosis. 

 After stopping medication, Harrison continued to work for some time. 
Retrospectively, he could tell Dr. Self that he knew he was disturbed when his sleep
became troubled, he was distracted, and he became increasingly preoccupied with
religious things that at first were conventional but moved into bizarre and delusional
thoughts. From reviewing Harrison's records and interviews with him, Dr. Self
understood that Harrison recognized it pretty early on when he was taken off medication. 
Harrison went back to that psychiatrist and complained about his inability to sleep and not
feeling well, but was given sleeping medication rather than resuming anti-psychotic
medication. For a period of some weeks into the beginning of this relapse, Harrison
sought help and was essentially rebuffed.

 Dr. Gripon testified that Harrison's illness dates back to his twenties. Now in his
mid-fifties, Harrison has a thirty-five year history of mental illness. Harrison did quite
well and was very functional on medication. It appeared he no longer needed medication
and with the agreement of his treating physician at the time, the medication was
discontinued. Harrison became ill again and proper steps were not put in place to prevent
the outcome. Harrison is clearly a treatment responder. He responds to small amounts of
medicine, and it is expected he will continue to respond. Dr. Gripon stated, "There's no
reason to expect that all of a sudden on medication he's gonna relapse into a state of
illness. That's not likely to happen."

 Dr. Gripon was aware that when sent to Vernon, Harrison questioned the doctors
about discontinuing medication. Dr. Gripon stated after Harrison had improved and been
substantially better for a period of time, he questioned the need for medication. Harrison
asked to have the medication reduced and discontinued, and that was done. After
Harrison developed some symptoms, medication was restarted with his agreement, and
those symptoms dissipated. Dr. Gripon agreed that incident enforced Harrison's belief
that he constantly needs medication. Dr. Gripon also said that unlike the noncompliance 
commonly encountered, he is aware of two periods of time in thirty years when Harrison
did not take medication. One was with the doctor's approval, and the second was at
Harrison's suggestion, but again with the doctor's approval. Dr. Gripon testified, "So,
really he's had 30 years of a history of compliance. Now, there was a period when it was
agreed that he could stop medication and it had a tragic outcome. But as far as
compliance, he has a better track record of compliance than most people I could bring in
here on even long notice." According to Dr. Gripon, no one knows of the need to remain
on medication better than Harrison. 

 Dr. Self also testified that at Vernon, Harrison talked with the psychiatrist about
the possibility of stopping medication. Dr. Self did not think it was a unilateral
consideration. According to Dr. Self, Harrison's "absolutely complete response" to the
medication would tempt a psychiatrist to think Harrison's illness was an episodic disease. 
On medication, Harrison "completely remits symptoms and is very high functioning." 
Because of the side effects of these medications, there is an onus on psychiatrists to try to
limit their use. Dr. Self testified, "[T]here is something almost compelling about trying to
see if the patient really needs that medication." In a highly controlled environment like
Vernon, he could understand how a psychiatrist and Harrison might question the need for
medication. Dr. Self considered this a turning point because after tapering off the
medication Harrison began to have signs of relapse. At that time, Harrison and his
psychiatrist made a firm commitment that Harrison had to have the medication, "and
there has not been a waiver in him since that date. And that was several years past." Dr.
Self further testified, "He probably has a better grasp than the vast majority of people I
interact with about the presence of his illness and about the necessity, the absolute
necessity for him to maintain medication." 

 Dr. Self stated that Harrison has been approached about changing his medication
to one of the second generation medicines that are better tolerated. Harrison "has
adamantly refused to consider that change because Prolixin (3) works and it has worked and
it's a consistent delivery system. And he doesn't want to even contemplate changing it
because it works so well for him, despite the fact that it causes minor side effects." (4) 
According to Dr. Self, Harrison has shown insight and knowledge into his illness and 
current circumstances, and has voiced to Dr. Self the ongoing need for treatment. Dr.
Self testified the drugs Harrison takes do not affect his judgment or cognitive abilities
except that his psychosis is prevented and holding psychosis in remission improves his
judgment. Harrison is able to do some fairly abstract and complex thinking. His rate of
thought, ability to initiate thought, and verbal working memory do not seem grossly
impacted. Dr. Self thinks Harrison could probably do even better on one of the newer
medicines, but Harrison has made "a very reasoned decision to stay with the one that
works."

 Dr. Gripon said he would be willing to provide medication management and report
any noncompliance. According to Dr. Gripon, if Harrison were to miss an injection, the
onset of illness would not be immediate. Dr. Gripon testified, 

[T]here's a gradual resumption of symptoms. A person more or less slips
into a state of increased psychosis. It's not a dramatic and sudden thing. In
fact, the way that medication is distributed through the body or in the
system it's actually not completely gone in two weeks. It's just that's [sic]
it's substantially less in two weeks. So, another injection is given at that
time to give you a flatter, even distribution over the course of a month; and
then it's repeated every two weeks. But people who have an exacerbation
of the illness of the type that Millet Harrison has, as evidenced by what
happened before, it was months before he actually ended up in the state that
he was in by early 1994. So, that's not gonna happen over night. It's not
gonna happen in two or three days. It's not even gonna happen in a week. 
But it would happen over a period of a few months. 


Dr. Gripon would not say a complete failure of treatment could not happen suddenly, "but
it would not happen very often and it wouldn't happen in this case because of his
sensitivity and response to treatment that's already been demonstrated for 30 years." 

 Likewise, Dr. Self testified that if Harrison missed an injection, it was highly
unlikely the deterioration would be immediate. The previous deterioration Harrison
experienced was a progression over several weeks into very flurried symptoms. Dr. Self
stated it is extremely unusual for there to be an abrupt onset of schizophrenic
deterioration; it is typically a slow deterioration, unlike some other psychiatric illnesses
that can change pretty fast. Dr. Self testified, "Especially with a long-acting medicine, it
takes several weeks to wash out that medicine."

 Millet Harrison testified he is willing to sign any necessary waivers to allow
mental health or medical providers to comply with court orders to report noncompliance
of treatment plans. Harrison testified he knows he needs medication and if he ever failed
to take it, he would realize something was wrong and want to report it. Harrison said if
he thought something was wrong, if he started not sleeping at night, he would
immediately contact his doctor because he knows that is a sign of relapse. Harrison said
he would go to Spindletop MHMR's ACT program daily if the treatment plan required it. 
When asked, "What if you didn't like it?", Harrison replied, "I've done many things I
didn't like in the past because I knew it would help me eventually." Harrison testified he
has not had any symptoms since he has been on medication. He has a side effect from the
medication which is a "shake" in his right hand. From the time at Vernon in 1995 when
he was taken off medication, Harrison said he learned "that I definitely need my
medication." Harrison testified, 

[B]efore I went to - before I got sick doctors were telling me they thought I
didn't need it. And I told them, I said, 'Well, my doctor told me I need to
take it for the rest of my life.' And one doctor said, 'I don't believe that,
you know. I think you're doing well enough you don't need it.' So he took
me off the medication and he put me on - I started having problems, started
having relapse. I didn't realize it was a relapse at first. But what I did, I
told the doctor I was having trouble sleeping and he gave me sleeping pills
which were experimental sleeping pills. And I thought maybe the sleeping
pills might have caused - might have had some affect on my actions back
then. I didn't know whether it was lack of medication or the sleeping pills. 
So, when I got to Vernon I asked the doctor to check it out, take those
medications and see whether the lack of medication caused me to do what I
did. And I realized that it was the lack of medication. And now I know that
and I'll always stay on medication. 


 Harrison could not foresee any reason why he might just disappear one day; he has
family, including a son, in the area. (5)
 If released to a less restrictive environment,
Harrison plans to seek gainful employment and would immediately qualify for social
security benefits. Harrison is ready and willing to pay whatever portion is needed to
participate in a treatment plan. It would be his goal to establish such a compliant,
cooperative record that he could assume full responsibility for the cost of his treatments
or expenses. Harrison would plan, under whatever cooperative treatment plan would be
ordered, to participate in counseling with Dr. Gripon as soon as he is financially able. 
Harrison is willing to comply with any reporting requirements to maintain a cooperative
treatment plan.

 Harrison read a statement to the Court in which he expressed his regret. He further
stated, 

Before doctors in Houston took me off medication I had never heard voices
before. And the voices did not come all at once. There were several
warning signs that preceded the voices, warning signs that I have since
come to recognize. First I had trouble sleeping. Then I became paranoid,
thinking that they were out to get me. Then came the delusional thinking,
thinking that the world was coming to an end or that people were trying to
communicate with me through television or radio. Then came the voices. I
do not think that I will ever allow the voices to affect me in the way it had
in my mother's case. I will never allow it to get to the voices. I will contact
my doctor the moment I start having trouble sleeping or getting paranoid in
any sense whatsoever. As a matter of fact, I have not experienced any
warning signs of my illness since September, '95, which is when I was
placed back on medication.


 Harrison said he was hospitalized prior to 1994. The first time was after reporting
that he was having trouble sleeping. He went to the Beaumont psychiatric hospital and
was told he needed medication, which was given. At that time, he did not realize he had
an illness. When he started going back to college at Lamar, he stopped taking his
medication for a few days. Harrison informed his doctor he was doing fine and had not
taken medication for a couple of days. The doctor told him he should never stop the
medication. Harrison started taking the medication again that day. But the next day, he
was taken out of classes at Lamar and put back in Beaumont Neurological Hospital. 
Harrison said he never stopped taking his medication since that time, that he was put back
on medication and took it. 

 Harrison stated he went to a psychiatric hospital one other time. This was after the
doctor had taken him off the medication. Harrison was hospitalized after hearing voices
while riding on a bus from Dallas to Houston. He did not go back on medication
following that incident, and it was after that he killed his mother. Harrison says he
recognizes he has to stay on medication the rest of his life.

 According to Harrison, it was eighteen or nineteen years from the time of the
incident at Lamar until the one with his mother. In that time, Harrison lived a normal life,
earned a college degree, a graduate degree, was employed, got married, and got divorced. 
He was taken off his medication, leading to the deterioration that resulted in the killing of
his mother. Harrison testified that while at Vernon, he tried to determine, in that
controlled environment, whether the doctors were telling the truth when they thought he
did not need medication, or whether it was the sleeping pills that caused him to do what
he did. He wanted to find out, he did, and now he knows he needs his medication. 
Harrison said that since 1995, he has been totally compliant with the medication and will
continue to do so for the rest of his life.

 The evidence indicates that if Harrison were off his medication, his condition is
expected to deteriorate. However, Dr. Self testified Harrison voluntarily takes his
medication and Dr. Gripon testified Harrison has a thirty-year history of compliance. 
Furthermore, the method of delivery ensures objective verification that he has received
medication and Dr. Gripon testified he would administer Harrison's medication and
report any failure to comply. The evidence established the medicine is long-acting and
any degeneration would not be immediate. 

 Taken as a whole, the evidence supports finding Harrison continues to the meet the
criteria for involuntary commitment. He is mentally ill, his condition is expected to
continue for more than ninety days, he has received court-ordered inpatient mental health
services under article 46.03 for at least sixty consecutive days during the last twelve
months, and, without treatment, is likely to cause serious harm to others, or suffer severe
and abnormal mental emotional or physical distress and experience deterioration of his
ability to function independently and make a rational and informed decision as to whether
or not to submit to treatment. Thus, under section 4(d)(5) of article 46.03, the next
question is "whether an order should be issued requiring the person to participate in a
prescribed regimen of medical, psychiatric, or psychological care or treatment on an out-patient basis as provided in Subdivision (4) of this subsection. If the court determines
that the acquitted person continues to meet the criteria for involuntary commitment and
that out-patient supervision is not appropriate, the court shall order that the person be
returned to a mental hospital. . .."

 Both Dr. Self and Dr. Gripon testified that Harrison no longer needs inpatient
mental health services. (6) In his report for the year 2003, Dr. Self recommended that
Harrison no longer requires the highly restrictive environment of a state hospital in order
to be safely and effectively managed in regard to his mental illness and behavior. Dr. Self
further recommended placement with family members under the provision that Harrison
be provided regular and frequent contact with trained mental health professionals for
monitoring of his condition, as well as assistance and support functions. Dr. Self
indicated the inclusion of Assertive Community Treatment Team services, which are
offered by Spindletop MHMR, would satisfy such a provision. Dr. Self testified the ACT
team offers the ability to actually see a patient daily, or several times a day if needed. 
The team is composed of a nurse, social worker, and case worker, has ready access to a
psychiatrist, is capable of furnishing a broad array of support services, and can provide
early detection of any signs of relapse, or things that might threaten relapse, such as
stressful events. 

 According to Dr. Self, support would come not only from the professionals at
Spindletop MHMR and Harrison's treating psychiatrist, but also from family members.
Dr. Self agreed that family members would be in a unique position to observe and notice
any changes in Harrison. Dr. Self testified it is common to have to rely on collateral
sources, such as family, friends, or close associates, to help detect early changes.

 At Rusk, Harrison resides on a ward where the door remains locked. Someone has
to lock and unlock that door for people to come and go, but for patients in which there is a
great deal of confidence, some degree of freedom is given. One level of freedom is to
have a client-worker job where patients are allowed to perform some task around the
hospital for a few hours a day in exchange for minimum wage. Harrison has had a job
washing dishes for quite some time, which necessitates his egress from the unit
unsupervised on two occasions a day, six days a week. Another level of freedom is
unescorted access to the grounds. For several months, Harrison has been granted about
an hour and a half to two hours a day when he can go out and walk the park and go to the
canteen without someone in attendance.

 According to Dr. Self, Harrison does not require inpatient treatment but needs
continued medication. The required supervision could be provided through Spindletop
MHMR and a supervising psychiatrist, and through family members and friends. Dr. Self
stated he believed Harrison capable of obtaining gainful employment, that Harrison is
highly motivated, and he would be amazed to see Harrison stay out of the work force. Dr.
Self certainly would not encourage him to refrain from working. Dr. Self could see him
living safely in the community and would have no problem with Harrison living next
door. Dr. Self did recommend Harrison reside with family members at this time. Dr. Self
also recommended Harrison receive intensive outpatient monitoring by the ACT team
through Spindletop MHMR. Dr. Self would want Harrison to have regular and frequent
psychiatric assessments either through Spindletop MHMR or Dr. Gripon, though Dr. Self
favored Harrison having access to a private psychiatrist. Dr. Self recommended the
treatment plan be ordered and monitored very closely by the court. Dr. Self could think
of no reason to return Harrison to Rusk. 

 Dr. Gripon stated that Harrison has been treated in a less restrictive facility than a
maximum security mental health facility for a good while. Harrison was for some period
at Vernon. When he reintegrated his thought processes and significantly improved in
regard to his mental state, he was transferred to Rusk, where he has been for a number of
years. The area of Rusk where he is housed is an open facility. Harrison is allowed to
come and go with passes. In Dr. Gripon's opinion, based on reasonable psychiatric
probability, Harrison no longer requires inpatient treatment and has "well-compensated"
his illness. There has been no evidence of psychotic symptoms for a number of years. In
Dr. Gripon's opinion, as long as Harrison remains under appropriate psychiatric care, he
is ready to be released to a less restrictive facility, such as living with family. Dr. Gripon
testified, "Harrison can reside with any responsible adult individual who was willing to
observe and use general common sense in helping him on a day to day basis." 

 Dr. Gripon had no differences with or objections to Dr. Self's recommendations
and report on Harrison. Rusk has very little to offer and over the last several years has
consistently recommended discharge to some kind of supervised setting. That setting
could involve living with a responsible family member, daily contact with mental health
providers, either at MHMR or in the private field, continuing counseling contact and
observations on a daily and semi-daily basis, and continuation of biweekly injections. Dr.
Gripon testified "there has to be some type of monitoring in which noncompliance would
be immediately reported." Dr. Gripon acknowledged that for the most part, the burden of
taking medication, compliance with treatment, and follow-up with treatment
recommendations would lie with any patient and the patient's family. 

 Diane Randle is Harrison's niece. She has known Harrison her whole life and is
aware of his past and his problems. Diane has been to Rusk to see Harrison. She has no
hesitation in allowing Harrison to live with her and said it would not cause a problem
with her neighbors. She does not fear for her safety and her family is supportive of 
Harrison living with her. 

 It is Diane's understanding that were Harrison released, he would be under specific
court orders. Diane was asked what she would do if she were made aware of those orders
and saw Harrison fail to comply. Diane said she would call his doctor, Dr. Gripon. If the
order said to call the trial judge, Diane said she would do that; she would do whatever the
order required. Diane testified that for over six years Harrison had never exhibited to her
any thought of stopping his medication, but if he did, she would report it, just as she
would if she noticed Harrison were not sleeping at night. According to Diane, there are
family members beyond those testifying on Harrison's behalf that would assist and do
whatever is necessary to help Harrison comply with the court order. 

 Diane lives alone and works a full-time job as the secretary at Ebenezer Baptist
Church in Beaumont from 9:00 a.m. to 5:00 p.m., Monday through Thursday. On
Sunday she would have church activities; there would be periods of time during the day
Harrison would be unsupervised. Her house is not fenced in and people could come and
go from the yard. Diane did not know if she could physically stop Harrison from leaving
the house or overpower him. At the time of the killing, Harrison's sister and another
niece were in the house. Diane was asked, "[W]ith all those people in the house
[Harrison] still did those things . . ." Diane replied, "It was a much larger house than
mine." 

 Diane said she would not allow Harrison to deteriorate to the point of danger to
anyone. Other than this incident when Harrison was off his medication, Diane has never
known Harrison to be violent or assaultive in any way. 

 Isaac Randle, Sr., is the father of Diane Randle and Harrison's brother-in-law. 
Isaac has known Harrison "about all of his life." Isaac is aware of Harrison's mental
illness and the treatment he received. Isaac knows of the time period when Harrison was
ordered to stop taking his medication and he did so, and the subsequent deterioration that
resulted in the death of his mother. Isaac understands that were Harrison allowed to live
with Diane she might need some help and is ready and willing to do whatever is
necessary to help not only her but also Harrison. Isaac said he would visit Harrison
"pretty regular" and if he noticed something odd or different, he would report it. Isaac
would report if Harrison said he was not sleeping well or if Isaac noticed Harrison
becoming overly anxious. Isaac is willing to assist Harrison in "getting the daily
treatments he might need a ride or transportation to." Isaac lives "some distance" from
Diane. Isaac did not think there would ever be a time when Harrison might become
assaultive to Diane. Isaac has been to Rusk to visit Harrison. They would check him out
and spend the whole day in a house Rusk provided for such visits, watch T.V., cook and
eat, "basically just spending time with him." Isaac never noticed anything abnormal
about Harrison.

 Isaac Randle, Jr., is the son of Isaac Randle, Sr. Isaac Jr. is thirty-nine and has
known Harrison all his life. Isaac Jr. lives in Corpus Christi. He has not been to see
Harrison at Rusk. Isaac Jr. attends family gatherings and functions and said that if in the
future he noticed anything out of the ordinary with Harrison he would immediately report
it to the doctor. Isaac Jr. said that is the sentiment of the rest of the family. 

 Rodney Haynes has been a friend of Harrison for several years and knows Diane
Randle. Haynes is aware of all the facts regarding Harrison's mental illness and the death
of Harrison's mother. Haynes is aware of the conditions and symptoms of Harrison's
mental illness and witnessed them for himself during the period of deterioration. If
Harrison were released to a less restrictive environment, Haynes would have contact with
him, "talk and visiting, more or less." Haynes would be willing to assist in whatever
treatment plans were ordered for Harrison. Haynes would be willing to report any
symptoms or exhibition of illness. Haynes is ready and willing to assist Diane in
whatever she might need. Haynes has seen Harrison at Rusk and observed him
interacting with individuals and has no hesitation for the safety of the community if
Harrison were allowed to live with Diane. Haynes works straight days at DuPont in
Beaumont as an engineer. Haynes would see Harrison evenings or weekends, but not
every day. 

 The evidence set forth above constitutes a scenario for outpatient services
consistent with the recommendations of both Dr. Self and Dr. Gripon. Both doctors
recommend Harrison's release from inpatient services and both approve the proposed
scheme for outpatient services as will be provided by Dr. Gripon, Spindletop MHMR, and
Harrison's family. There was no expert testimony recommending Harrison remain an in-patient at Rusk.

 The dissent contends there is contrary evidence to that set forth above. At a
hearing in February 2003, Dr. Self testified Barbara Fleming told him "that likely they
would not provide that specific service but that they could provide another service that
would amount to him being visited twice a week, which meets my requirements for
routine observation of him by someone trained and skilled and someone that can facilitate
him getting the services should he begin to relapse." Fleming testified, "We have the
regular adult and we have the act, which is the accelerated . . . he would be - he's too
high functioning for that. That's a daily program where the whole act team is available
for that one client. . ." It would appear that Fleming's "act team" and Dr. Self's "ACT
team" are one and the same. Furthermore, the State never questioned Dr. Self's
assertions in the December hearing that ACT services would be available to Harrison. 
There is no evidence from that hearing suggesting Dr. Self's testimony is incorrect.

 The dissent further points to testimony from Barbara Fleming wherein she
admitted that if a person stops reporting for treatment or care, sometimes their file may be
set aside or closed out, with no further contact. We first note the monitoring scheme
proposed by Dr. Self and Dr. Gripon does not rely solely upon MHMR. Even so, section
4, subsection (d)(6), requires MHMR to notify the court if Harrison fails to comply with
the court-ordered regimen of out-patient care, or if Harrison's condition deteriorates to
the extent that out-patient care is no longer appropriate. Fleming was unaware of any
such requirement and when asked if she would notify the court pursuant to a court order,
stated, "that would have to go through people higher than I am." It was not ascertained
whether the patients MHMR "loses track of" were involuntarily committed and there is
no evidence in the record any of those patients were ever acquitted by reason of insanity. 
We cannot simply assume that MHMR will fail to comply with a court order.

 The dissent also relies upon the evidence that Harrison's niece works four days a
week and has church activities on Sunday. There is no evidence in the record that
Harrison needs constant supervision.

 We are aware, as the dissent points out, that our prior opinion states, "Harrison had
a history of not taking his medication." Harrison, 1999 WL 160825, at *3. Our
conclusion, however, has since been refuted, as the evidence set forth above clearly
demonstrates. When the Amarillo court considered Harrison's case in 1999, it noted that
Dr. Gripon testified that Harrison's records indicated his medication was discontinued
while under a doctor's care. See Harrison, 1999 WL 994378, at * 3. At the December
hearing, Dr. Self testified Harrison voluntarily takes his medication. Dr. Gripon testified
Harrison has a thirty-year history of compliance, with two exceptions, both times with a
doctor's approval. Our conclusory statement in a prior opinion cannot be relied upon as
evidence in light of the uncontested testimony presented last December.

 For all these reasons, we conclude the trial court's finding that out-patient
supervision is not appropriate is not supported by the record. Therefore, we reverse the
judgment of the trial court and remand for further proceedings consistent with this
opinion. (7)

 Our resolution of these issues makes it unnecessary to address Harrison's third
issue. REVERSED AND REMANDED.


 ________________________________

 DON BURGESS

 Justice


Submitted on July 2, 2004 

Opinion Delivered October 27, 2004

Publish


Before McKeithen, C.J., Burgess, and Gaultney, JJ.


 DISSENTING OPINION

 The purpose of a civil commitment of a violent insanity acquittee is not only to
treat the individual's mental illness but also "to protect him and society from his potential
dangerousness." See Jones v. United States, 463 U.S. 354, 368, 103 S.Ct. 3043, 77
L.Ed.2d 694 (1983). The Texas Legislature has imposed a requirement that a violently
insane acquittee "may only be discharged by order of the committing court in accordance
with the procedures specified in this subsection." See Tex. Code Crim. Proc. Ann. art.
46.03, § (4)(d)(5) (Vernon Supp. 2004). "The concern motivating the judicial release
requirement" is "protecting the public from a dangerous and mentally unstable
individual." State v. Roland, 973 S.W.2d 665, 667 (Tex. 1998). 

 The judicial release provision, article 46.03, section (4)(d)(5), says that if the court
finds the acquittee meets "the criteria for involuntary commitment" and "outpatient
supervision is not appropriate," the court "shall order that the person be returned to a
mental hospital or other appropriate inpatient or residential facility." See Tex. Code
Crim. Proc. Ann. art. 46.03, § 4(d)(5) (Vernon Supp. 2004). Therefore, in considering a
judicial release under section 4(d)(5), the committing court must decide 1) whether the
acquittee meets the criteria for involuntary commitment, and 2) whether outpatient
supervision is appropriate. I agree Harrison meets the criteria for involuntary
commitment. I disagree with the majority's reversal of the trial court's decision on the
inappropriateness of the outpatient supervision requested by Harrison. 

 This is not the first time this Court has considered Harrison's argument. See
Harrison v. State, 1999 WL 160825 (Tex. App.--Beaumont Mar. 24, 1999, no pet.) (not
designated for publication). The Court wrote then as follows:

 Harrison has a twenty year history of schizophrenia. In 1993,
Harrison strangled his mother, then mutilated her body by cutting off her
head, cutting out her heart, and cutting out her eyes.

 . . . .

 Harrison continues to suffer from chronic paranoid schizophrenia. 
Harrison had a history of not taking his medication. Although he has
responded to treatment with psychotropic medications in an in-patient
setting, none of the doctors suggested Harrison is capable of maintaining
medication on his own, and no alternative treatment facility was available. 
Although he recommended outpatient commitment rather than continued in-patient treatment, the facts stated in Dr. Korman's report support the
required findings under Health and Safety Code Section 574.035
(a)(1)(2)(C) and (3). None of the doctors suggested releasing Harrison from
court-ordered mental health services. Although in the opinion of all three
doctors Harrison is not a threat to others so long as he receives treatment, it
is clear from the reports and Harrison's patient history that dire
consequences would result from a discontinuation of that treatment. The
evidence tends to confirm the likelihood that absent treatment Harrison
would suffer distress and deterioration of his ability to function or that he
would seriously harm others.


Id. at *2, 3. 

 Harrison meets all the criteria for court-ordered treatment on an inpatient basis. 
He is mentally ill. See Tex. Health & Safety Code Ann. § 574.035(a)(1) (Vernon
2003 & Supp. 2004). Absent treatment, he is likely to cause serious harm to others. Id. at
§ 574.035 (a)(2)(B). His mental illness is incurable. The condition is "expected to
continue for more than 90 days." Id. at § 574.035(a)(3). He has received court-ordered
inpatient health services "for a least 60 consecutive days during the preceding 12
months." Id. at § 574.035(a)(4). Under article 46.03, if an acquittee meets the criteria for
involuntary commitment, the committing court may nevertheless consider the
appropriateness of outpatient supervision. See Tex. Code Crim. Proc. Ann. art. 46.03, §
4(d) (5) (Vernon Supp. 2004). But the appropriateness of outpatient supervision is not
merely a treatment issue. Rather, the decision includes consideration of the difficulty in
monitoring compliance and assuring public safety. See Tex. Code Crim. Proc. Ann. art,
44.03, § 4(d)(6) (Vernon Supp. 2004). 

 In determining the appropriateness of outpatient supervision, the committing
court's focus is the same as that of the statute: the outpatient supervision must be able to
assure compliance with the treatment regimen, monitor the acquittee, and timely detect
deterioration of his condition. See id. The majority notes Dr. Self felt that intensive
outpatient monitoring of Harrison by the ACT team through Spindletop MHMR would
satisfy Harrison's need for regular and frequent contact with trained mental health care
professionals. In December 2003, Dr. Self testified ACT services are "services offered by
the community health centers, Spindletop in this case." In February 2003, the trial court
heard Dr. Self testify Spindletop did not provide the specific ACT service, though one of
its other services meets Dr. Self's requirements. And in February 2003, a representative
from Spindletop testified MHMR sometimes loses track of patients: 

Q. [State's counsel] Ms. Fleming, if I understood you right, you prefer that
if Millet Harrison is not reporting to M.H.M.R., that some family member
call the Court and notify the Court that he's not in compliance.


 A. [Spindletop Representative] Well, we can't.


 Q. You can't call the Court and say --


 A. Do that.


 Q. -- "Millet didn't come for his injection today." Is that correct?


 A. We don't normally do that.


Q. Do you experience sometimes at M.H.M.R. that if a person stops
reporting to M.H.M.R. for treatment or care that sometimes their files may
be just set aside or closed out, just no further contact with M.H.M.R. with
this patient? Is that true?


A. Yeah. They usually surface at a state hospital or other psychiatric
facilities. 


Q. After they've gotten away from the medication, problems come up and
they appear somewhere in the system.


 A. Uh-huh.


 Q. Is that a "yes"?


A. Usually -- well, the one thing that can be done, if he's not in compliance
and begins to not show up, is that they would inform me; and then I could
pursue attempting to get ahold of him by family and whatever means.


Q. But if you can't get ahold of him or family, you-all can't call the Court
and say, "We didn't see Millet today."

 A. I'm not saying we absolutely could not.


 Q. But you generally don't.


A. We're just so -- we have so many clients and we're so busy, it would be
easy at times to overlook that. But we do have secretaries that, if an
appointment is missed, they call to find out if it needs to be rescheduled or
when they want to reschedule.


Q. But like you said, many times a person does not appear and you don't
see them again until they surface somewhere in a mental hospital
somewhere down the road; is that correct?


 A. Yes.


 Q. Thank you, ma'am.


The trial court concluded the Spindletop MHMR facility would not provide adequate
supervision for Harrison. Dr. Gripon testified there has to be some type of monitoring in
which noncompliance would be immediately reported. Harrison's niece, with whom he
would be living, works full-time, and the court concluded she could not provide sufficient
supervision. Texas law does not require that the committing court allow inadequate
outpatient supervision of a violently insane acquittee. 

 No expert suggests Harrison should be released from court-ordered treatment. 
Nevertheless, the majority's decision is grounded in part on a conclusion there is no
evidence demonstrating Harrison would not voluntarily take his medication. The
majority goes so far as to reject this Court's reference in a prior opinion to Harrison's
"history of not taking his medication." See Harrison, 1999 WL 160825, at *3. But even
the criteria for court-ordered outpatient treatment under the Health and Safety Code
requires a finding, by clear and convincing evidence, that "the proposed patient has an
inability to participate in outpatient treatment services effectively and voluntarily . . . ." 
See Tex. Health & Safety Code Ann. § 574.035(b)(2)(D) (Vernon Supp. 2004). I do
not believe it is appropriate to rely on voluntary treatment in assessing the adequacy of
available supervision to assure Harrison's compliance. The majority does not suggest
Harrison should be released from court-ordered treatment and allowed to make his own
treatment decisions. Court-ordered treatment is required because voluntary compliance is
unreliable. The facts establish Harrison has a mental illness that, when untreated, makes
impossible a rational and informed decision by Harrison to submit to voluntary treatment. 
If he does not take the medication he is a danger to others. He meets the criteria for
court-ordered inpatient treatment and he may be ordered to take psychoactive
medication. (8) The majority errs in reversing the committing court's judgment that
outpatient supervision is inappropriate. I believe the committing court charged with the
statutory responsibility for the supervision is entitled to deference in making that
discretionary judgment. The judge considered the difficulties of the suggested
supervision and found the requested outpatient supervision inappropriate. I would affirm. 
Because the majority does not, I respectfully dissent. 


 _________________________________

 DAVID GAULTNEY


Dissent Delivered

October 27, 2004

1. [1]All references to article 46.03 in this opinion are to this Act.
2. [2]The 2003 amendment was effective January 1, 2004, and therefore is not applicable
to this case. However, it is not substantive but only reflects the repeal of article 46.02 of the
Code of Criminal Procedure and its replacement by Chapter 46B. All references in this
opinion to section 574.035(a) are to this Act.
3. [3]Harrison takes Prolixin decanoate, the generic name is Fluphenazine, a time-release
form of an antipsychotic. Given in an oil immersion that is injected every two weeks, it
produces a blood level that is sustained over that two-week period. 
4. [4]The side effects Harrison experiences are tremors in his upper extremities. Harrison
takes medicine at night to stop the tremors during sleep; during the daytime he tolerates a
mild tremor. 
5. [5]His son is now twenty-one and attending college in Houston.

6. [6]As both prior opinions indicate, that has not always been Dr. Gripon's position. See
Harrison v. State, No. 09-98-134-CR, 1999 WL 160825 (Tex. App.--Beaumont Mar. 24,
1999, no pet.) (not designated for publication); Harrison v. State, No. 07-99-0259-CR, 1999
WL 994378 (Tex. App.--Amarillo Nov. 2, 1999, no pet.) (not designated for publication). 
7. [7]Pursuant to article 46.03, section 4 (d)(4), it is within the trial court's discretion to
determine the appropriate regimen of medical, psychiatric, or psychological care or
treatment, which could include psychoactive medications. Tex. Code Crim. Proc. Ann. art.
46.03, § 4 (d)(4) (Vernon Supp. 2004).
8. [8]The Heath and Safety Code provides in part, "A judge may advise, but may not
compel, the proposed patient to: (1) receive treatment with psychoactive medication as
specified by the outpatient mental health services treatment plan . . ." See Tex. Health &
Safety Code Ann. § 574.035(j)(1) (Vernon Supp. 2004) (emphasis added). But article
46.03, section 4(d) says the committing court may order a prescribed regimen of medical,
psychiatric, or psychological care or treatment. Harrison meets the criteria for court-ordered
inpatient treatment. He may be ordered to take the medication. See article 46.03, section
4(d).