In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00099-CV
_____

MILLET HARRISON JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause No. 66306

MEMORANDUM OPINION

In 1994, Millet Harrison Jr. was found not guilty by reason of insanity for the murder of his mother and was committed to a mental health facility. *Harrison v. State,* 179 S.W.3d 629, 631 (Tex. App.—Beaumont 2005, pet. denied). The trial court has renewed Harrison's involuntary inpatient mental health commitment each year. *Id.* On January 22, 2014, the trial court again entered an order of commitment continuing Harrison's inpatient mental health services. In two appellate issues, Harrison challenges the legal and factual sufficiency of the evidence to support the

trial court's order extending his inpatient mental health treatment. We reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

Under a legal sufficiency review when the burden of proof is "clear and convincing" evidence, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 634. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could. *Id*. Under a factual sufficiency review, we consider all the evidence, both in support of and contrary to the trial court's findings, and we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. at 634-35. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *Id*. at 635. We consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding. *Id*.

The report by psychiatrist Dr. Edward Gripon, which described his psychiatric evaluation of Harrison, was before the trial court. In his report, Gripon explained that he has "had significant and ongoing contact" with Harrison since

1994 and has "evaluated him on numerous occasions." Gripon stated in the report Harrison's records from Rusk State Hospital "reveal complete compliance with treatment recommendations and unit rules in the State Hospital for the past 12 months." Gripon noted that Harrison's psychoactive medication, Risperdal, was "currently provided on the unit in a 'self-medication fashion', in that, he signs for medicine, takes it and this is done independently under nursing supervision." In addition, Gripon noted that Harrison works on the unit and is "on what is essentially an open unit . . . ." According to Gripon's report, Harrison is able to move about the grounds "without significant supervision and has shown no tendency to violate this, or any other, extended privilege[,]" and Harrison's level of function "represents essentially the highest level obtainable, while still hospitalized . . . ."

Gripon stated in his report that Harrison's records from Rusk "reveal[] only positive comments about his performance/level of function[.]" Gripon's report further indicated that Harrison "explained his suspicions/paranoia, in certain areas, of his continued confinement and the process in which he's been involved for a number of years in attempting to achieve a [] less restrictive environment. His explanation appeared clearly reasonable under his[] somewhat difficult, but obvious[,] circumstances." Gripon's report indicated that he found no evidence of

any thought disorder and opined that Harrison's "thought process is free of hallucinations, both auditory and visual, delusions[,] and illusions." Gripon diagnosed Harrison with schizophrenia, paranoid type, "in complete remission." Gripon noted that if Harrison were released, Rusk had arranged for Harrison to enter a group home in Houston, the Modest Family Care Facility "where he would be under continued supervision and medication monitoring." In the report, Gripon opined that Harrison has "achieved optimal response from inpatient psychiatric treatment intervention over these many years" and that Harrison "is not going to improve from his current state with further inpatient treatment." Gripon noted in the report that Harrison "is, and has been for many months, compliant with taking antipsychotic medication. . . ." Gripon's report concluded that "the presiding Court should consider Millet Harrison at this time, to be in optimal inpatient treatment status/condition and, at least, consider a release to a step down/less restrictive treatment setting."

Dr. George Howland, a psychiatrist at Rusk, testified that he has been Harrison's physician for approximately two years. Howland explained that Harrison suffers from paranoid schizophrenia and takes a daily medication, Risperdal, for his illness. According to Howland, Harrison's condition would deteriorate if he were not treated, and Harrison's mental illness will persist for the

rest of Harrison's life. During cross-examination, Howland testified that schizophrenia is a neurochemical, physiological disorder that may cause patients to have disorganized thoughts, hear voices, become paranoid or delusional, and have "fixed false beliefs." According to Howland, paranoid schizophrenia is treatable with medications that alter the person's neurochemistry. Howland explained that Harrison has "done well" and is "currently not having any psychotic symptoms." Howland testified that Harrison takes his medication, signs in and out of his unlocked unit, and has a job at the hospital.

According to Howland, a social worker has formulated a plan for Harrison "to go to a personal care home in the Houston area" if the trial court were to order that Harrison no longer required inpatient care. Howland explained that Harrison has been self-administering his medication at Rusk with a nurse's supervision. Howland testified, "I don't know that they have a nurse there at the personal care home; but Millet knows his meds and when he needs to take [th]em. So, I feel confident he could take his meds fine." Howland explained that someone from the personal care home, Modest Family Care Facility, would notice if Harrison were "not acting right" or refusing to take his medication. Howland testified that Harrison has "always told me that he needed to stay on his meds and that he had a mental illness." Howland also admitted that Harrison's statements to the trial court

5

at previous hearings, when Harrison indicated he was not mentally ill and did not need medication, showed a lack of insight. Howland's report was also before the trial court. In the report, Howland opined that "Harrison is stable psychiatrically, and is not a danger to himself or others[,]" and he "recommended that Mr. Harrison be discharged to the community to a transitional living placement."

At the hearing, Harrison's counsel argued that Harrison's ingestion of Ambien, combined with his schizophrenia, "caused the mental instability that resulted in the death of his mother." According to Howland, Ambien can cause psychosis, but in Howland's experience, when patients stopped taking the drug, their psychosis cleared. Howland testified that Ambien may have exacerbated Harrison's schizophrenic psychosis, and "Ambien is one part of [Harrison's] issue." Howland explained that "the other issue that came up was [Harrison's] psychiatrists had recommended him, back at that time in '94, to get off all of his meds . . . and that was also leading up to this incident when he murdered his mother." Howland opined, "We don't have an issue with [Harrison] taking his meds now. In fact, . . . he didn't get his meds . . . the first day he was in the jail here; and he asked the captain to get him the meds." According to Howland, if Harrison stopped taking his medication, he would be a danger to the community. Howland stated that he was unconcerned about patients' refusal to take other

6

medications "if they take their psychotropic meds." Howland opined that Harrison is "fine to go [in]to the community" and has "good insight." According to Howland, it is incongruous that someone convicted of murder may receive parole, yet Harrison cannot be released to outpatient care.

Clinical psychologist Dr. Dan Roberts testified that, for several years, he has been asked to review and evaluate Harrison's records. Roberts testified that Harrison suffers from paranoid schizophrenia, and Harrison's condition would continue to deteriorate and he would suffer severe mental or emotional distress if untreated. According to Roberts, Harrison's condition will last more than ninety days, and Harrison should remain in a court-ordered inpatient mental health treatment program.

Roberts testified that he believed Harrison might be hallucinating because in August 2013, Harrison had complained of being unable to sleep because patients were "up all night playing Ping-Pong[,]" but a staff member said "that was never true, that didn't happen[.]" According to Roberts, Harrison had also complained about a nurse tampering with his medicines because the pills had gotten wet and "argued with a staff member about a lunch tray." Roberts testified that Harrison had an argument with another patient about a news report concerning the Trayvon Martin case and "displayed aggressive behavior" by arguing with another patient

and a staff member. In addition, Roberts explained that Harrison refused to take vaccines for flu and pneumonia and refused to take an antibiotic for an infection.

According to Roberts, Harrison "thinks that Ambien . . . caused him to become psychotic and kill his mother. He has often tried to influence his doctors to stop his medicine, to let him have trials without it to see how he would do . . . ." Roberts further testified that when Harrison's medicine "is changed or adjusted or when he's transitioning from one medicine to another, he often has become more psychotic." Roberts explained, "The fact that he's continuing to question his medicine this year, recently, suggests to me that he's still delusional about that." According to Roberts, one of Harrison's psychiatrists noted in 1995 or 1996 that although Harrison has "a very persistent underlying delusional system, which was untouched by the medicine apparently, . . . [Harrison] does have the ability when he is medicated to tone it down and not talk about it much."

Roberts explained that although Harrison has blamed the killing of his mother on his ingestion of Ambien, Harrison had a long history of mental health issues prior to that time, and that Harrison's first hospitalization for mental health problems occurred in 1975. Roberts testified, "I think that [Harrison] blames the schizophrenic outbreak on the Ambien[,]" although Harrison had been hospitalized "about five or six times previously." According to Roberts, Harrison stated in 2011

8

that he did not think he is mentally ill and does not need medication. Roberts opined that Harrison lacks insight into his condition, and he explained that lack of insight is one of the "hallmarks" of Harrison's condition. A week before trial, Roberts attempted to visit Harrison at the jail, but Harrison refused to permit the visit. Roberts testified that he disagreed with the conclusions of both Howland and Gripon concerning Harrison.

Theresa Allen, a social worker from the Hope Unit at Rusk, testified that she manages Harrison's case. Allen explained that she serves on a recovery team that assists Harrison "with different things he needs[,]" and she also serves as "a liaison between the hospital itself and the Mental Health Authority and his family." According to Allen, if Harrison were released, "the Mental Health Authority would take over the case management services for him." Allen testified that she deals with Harrison on a daily basis, and Harrison "is very compliant in every area." When asked about testimony from previous witnesses concerning alleged incidents of belligerence by Harrison with other patients, Allen testified, "I'm not aware of those[,]" and she explained that Harrison has had no problems in the last year. Allen explained that Harrison had requested that people not play ping pong after a certain time of night, and she explained that there was a ping pong table in the

room next to Harrison's, and Harrison's room and the game room share a wall, so Harrison was not experiencing a delusion.

Jim Larue, the director of social services as well as the director of Rusk's Hope Unit, where Harrison is housed, testified that if Harrison were released to an outpatient treatment setting, he would be transported to the Mental Health Authority for an intake appointment and interview, and he would then be taken to a group home. According to Larue, the purpose of the interview would be to establish Harrison's care plan and "get him into their system so that they can make sure he has a doctor's appointment and everything that he needs for follow-up." Larue explained that the group home is a residence where Harrison would receive assistance with his daily living needs, such as access to medication and transportation to appointments, and the Mental Health Authority would provide Harrison mental health services at a different location. Larue testified that if Harrison began to manifest schizophrenic symptoms, the group home would notify the appropriate mental health authorities. Larue testified that, as unit director, he receives notice when a patient is having behavioral problems, but he has received no complaint about Harrison in the past year, and he described Harrison as "a model patient[.]" According to Larue, Harrison has "been very stable and

maintained our highest privileges[.]" Larue explained that homes such as Modest Family Care Facility do not typically have a nurse on staff.

Licensed professional counselor Cliff Hubel of Spindletop MHMR testified that he is familiar with Harrison and served as a liaison between MHMR and Rusk regarding a contingency discharge plan for Harrison. Hubel explained that the plan is to discharge Harrison to Modest Family Care home, a group home in Houston. Hubel testified that he has previously discharged five or six patients to the Modest Family Care home, but all of those individuals had been subject to civil commitment rather than forensic commitment. Hubel stated that he has never visited the home personally, but he testified that his supervisor personally visited the home before Hubel placed anyone there, and his supervisor reported that the home was "satisfactory for placement."

Hubel explained that the facility is a house owned by an individual, and it is funded through its residents. In addition, Hubel explained that the primary purpose of the home is to provide a residence, and mental health services are not provided there. According to Hubel, the owner of the home told him that the property "is next to a partial hospitalization program, which is like a day -- almost an outpatient thing during the day to where they have access to doctors, counselors, things of that sort." Hubel explained that Harris County MHMR would provide mental

health services for Harrison if he were released. Hubel believed the owner of the group home would provide transportation to Harrison for his trips to MHMR, and he noted that public transportation is also available. Hubel noted that the owner of the group home "can be difficult to get in touch with sometimes." In addition, Hubel testified that sometimes people in the mental health system stop appearing for their medication and treatment and disappear into society. Hubel testified that dangerous criminals "are paroled every year[.]"

According to Hubel, a representative of MHMR told him that MHMR "didn't care much for that home." Hubel testified, "[b]ut for us it's been a big help because [the owner has] taken folks that I couldn't find placement for anywhere else in the state." Hubel explained that the home may be rundown, the facility may not be a licensed group home, and "it wouldn't be one of the top choices . . . ." According to Hubel, Harrison is a difficult client to place due to the nature of the offense for which he was found not guilty by reason of insanity.

Harrison testified that he acknowledges he has a mental illness, but in 2011, he contended that he was in complete remission based upon advice from his attorney. Harrison also explained that Roberts became involved in the case after Harrison won an appeal of his inpatient commitment in 2004, and the trial court subsequently retained Roberts to testify regarding new evidence of noncompliance

with medication.[1]  Harrison testified that the medications he had refused were Metamucil, an antibiotic, and Benadryl. According to Harrison, Roberts has been the "D.A.'s mouthpiece ever since" and has misrepresented things Harrison told him, and that is why Harrison refused to see Roberts. In addition, Harrison testified that his bedroom was next to the ping pong room, and after he told the staff that the ping pong games were disturbing his sleep, the staff closed the room after a certain hour.

Harrison explained that when he killed his mother, his doctor had taken him off his psychiatric medications and had prescribed Ambien for insomnia. Harrison testified that he had never heard voices until he began taking Ambien. According to Harrison, the voices became louder and more demanding, and around that time, his uncle asked him to come to Beaumont because his mother had been injured at work. Harrison testified that he reported the voices to his psychiatrist, but his doctor instructed him to continue taking only Ambien and told Harrison he would decide whether to put him back on psychiatric medications when Harrison returned from Beaumont in two weeks. Harrison explained, "[t]he voices were telling me all sorts of things, that my mother was of the devil; . . . [t]hey tried to tell me my son was an evil person." According to Harrison, the voices then changed and began

_____

[1]*Harrison v. State*, 148 S.W.3d 678 (Tex. App. –Beaumont 2004, no pet.).

telling him that he loved his mother and if he ended her suffering, she would go to heaven. Harrison explained, "I didn't say the Ambien caused the mental illness. I said the Ambien caused the voices."

Harrison testified that on his current medication, five milligrams of Risperdal, his thinking is clear and he does not have delusional thoughts or paranoia. Harrison also explained that he began refusing to take a flu shot after the swine flu outbreak. According to Harrison, he spoke with the owner of Modest Family Care facility, and she told him that the house where she would place him has about five beds, a bed is available for Harrison, and the house is "right next to . . . Harris County Psychiatric Facility, a major psychiatric facility . . . . So, it's close to all the doctors and . . . nurses or whatever you need; and she said that she'd be glad to have me if the Court ordered me sent there." Harrison testified that if the court released him to outpatient treatment, he planned to continue to take his medication because it "works fine" and he has "no problem with taking Risperdal." Harrison explained that when he encountered problems with not receiving his medication while he was at the county jail, he addressed it with the authorities and they began giving him his medication in the proper amount. Harrison testified that if he is released to outpatient treatment, he will be in Houston, where his son also resides.

14

Harrison admitted that when he was confined at Vernon State Hospital, he asked the doctors to stop his medications under controlled conditions to see what effect the medications had, and he explained that after eight or nine months without medication, he began having delusional thoughts and reported those thoughts to the doctor. Harrison denied hearing voices while off medication, and he testified that Ambien, not his mental illness, caused the voices. Harrison claimed that the transcripts of prior hearings, in which he had said he was not mentally ill and did not need medication, were inaccurate.

Investigative reporter Jerry Jordan testified that he covered Harrison's hearing the previous year, and after the hearing, he went to Houston, looked at the Modest Family Care Facility, and photographed the facility for a news story. Jordan explained that he spoke with the owner of the facility, and the owner told him she was unwilling to take a patient like Harrison. In addition, Jordan testified that the psychiatric facility is ten blocks away, not next door. According to Jordan, the owner of the facility told him no sex offenders resided at the home, but Jordan found sex offenders present during the course of his research.

A trial court may order extended inpatient mental health services only if it finds, from clear and convincing evidence, that the proposed patient is mentally ill, the condition is expected to continue for more than ninety days, and the patient has

received court-ordered inpatient mental health services for at least sixty consecutive days during the preceding twelve months. Act of April 29, 1991, 72nd Leg., R.S., ch. 76, §1, 1991 Tex. Gen. Laws 515, 589 (amended 1995, 1997, 1999, 2003, 2011, 2013) (current version at Tex. Health & Safety Code Ann. § 574.035(a) (West Supp. 2014)). The patient must (1) be likely to cause serious harm to himself or others; or (2) if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, continue to experience deterioration of his ability to function independently, and be unable to make a rational and informed decision as to whether or not to submit to treatment. *Id*. To be clear and convincing, the State must present expert testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of his ability to function. *See id*. (current version at Tex. Health & Safety Code Ann. § 574.035(e) (West Supp. 2014)).

The trial court found that (1) Harrison is mentally ill and is likely to cause serious harm to himself or others or, (2) if not treated, he will continue to suffer severe and abnormal mental, emotional, or physical distress, to experience deterioration of his ability to function independently, and be unable to make a rational and informed decision as to whether to submit to treatment. Additionally,

16

the trial court determined that "no sufficient settings for care on an out[]patient basis exist[] at the present time, or in the foreseeable future."

It is undisputed that Harrison suffers from chronic paranoid schizophrenia and his condition requires medication, and the record demonstrates that Harrison's illness is expected to continue for at least ninety days and Harrison has received court-ordered inpatient mental health services for at least sixty consecutive days during the preceding twelve months. The court heard testimony that, if untreated, Harrison will likely cause harm to himself or others, continue suffering from abnormal mental, emotional, or physical distress, and experience deterioration of his ability to function independently. Additionally, the record demonstrates that Harrison has a history of stable periods followed by unstable periods and believes that his mental illness originated from causes other than natural progression. However, Howland testified that Harrison was completely compliant with his psychiatric treatment regimen and had not been aggressive, paranoid, or delusional, and he believed Harrison would continue taking his psychiatric medication in an outpatient setting and recommended outpatient treatment. In addition, Gripon's report stated that Harrison had been compliant with taking his antipsychotic medication and recommended a less restrictive treatment setting.

Roberts did not believe that Harrison has sufficient insight into his illness, and Howland testified that Harrison's testimony at previous hearings concerning his belief that he is not mentally ill and does not need medication showed a lack of insight. The trial court heard evidence that when Harrison's medication is adjusted or he is transitioning from one medication to another, he becomes more psychotic, and Roberts testified that one of Harrison's treating psychiatrists noted in 1995 or 1996 that Harrison has a persistent underlying delusional belief system that is unaffected by his medication. However, there was no testimony that changes to the amount or type of Harrison's psychoactive medication are anticipated. Roberts testified that within the last twelve months, Harrison had arguments with other patients and staff members and behaved aggressively, but other witnesses testified that Roberts's suggestion that Harrison hallucinated noises from a ping pong game was inaccurate because Harrison's room was located next to the ping pong room. Larue and Allen denied knowledge of the arguments and behavioral issues about which Roberts testified. Roberts also testified that Harrison had previously sought to have his medication decreased or discontinued, and Harrison testified similarly concerning a period when he was confined at Vernon. However, there was no evidence indicating that Harrison currently believes he is not mentally ill and does not need psychoactive medication.

There was no evidence that, during the preceding year, Harrison had been non-compliant with respect to taking his psychiatric medication. Rather, the evidence indicated that Harrison had fully complied with his psychiatric medication regimen, and the only evidence of any non-compliance with medical treatment involved non-psychiatric medications and treatments. Howland testified that he is unconcerned about refusal of other types of medication if patients such as Harrison continue to take their psychotropic medications.

The trial court also heard testimony that the Modest Family Care facility is not a licensed group home, its owner was unwilling to accept Harrison as a resident, and the facility is located ten blocks away from a psychiatric facility. The trial court heard conflicting evidence about the suitability of the Modest Family Care facility as an outpatient facility for Harrison, as well as the difficulty of finding a placement for Harrison, but the trial court's finding that no suitable outpatient settings exist for Harrison is unsupported by the record. Although the trial court, as factfinder, was required to determine which testimony to accept as credible, on this record, the trial court could not reasonably have formed a firm belief or conviction that Harrison continues to meet the criteria for involuntary inpatient commitment. *See Harrison*, 179 S.W.3d at 635, 638. The disputed

19

evidence is such that a reasonable trier of fact could not have reconciled the disputed evidence in favor of its finding. *See id*. at 635.

We conclude that the evidence is legally and factually insufficient to support the trial court's finding that outpatient supervision is not appropriate for Harrison. Accordingly, we sustain Harrison's issues, reverse the trial court's judgment, and remand this cause for further proceedings consistent with this opinion.[2]

REVERSED AND REMANDED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on August 13, 2014
Opinion Delivered October 30, 2014

Before McKeithen, C.J., Kreger and Johnson, JJ.

_____

[2]Pursuant to article 46C.263(c), the trial court has discretion to determine the appropriate regimen of medical, psychiatric, or psychological care or treatment, and the regimen may include psychoactive medication. Tex. Code Crim. Proc. Ann. art. 46C.263(c) (West 2006). Article 46C.263(d) provides that "[t]he court may order that supervision of the acquitted person be provided by the appropriate community supervision and corrections department or the facility administrator of a community center that provides mental health or mental retardation services." *Id*. art. 46C.263(d). In addition, article 46C.263(e) permits the trial court to order Harrison "to participate in a supervision program funded by the Texas Correctional Office on Offenders with Medical or Mental Impairments." *Id*. art. 46C.263(e).

DISSENTING OPINION

The majority concludes that "the trial court could not reasonably have formed a firm belief or conviction that Harrison continues to meet the inpatient criteria for involuntary commitment," and that the evidence was "legally and factually insufficient to support the trial court's finding that outpatient supervision is not appropriate for Harrison." I respectfully disagree.

It is uncontested that Harrison is mentally ill, and due to his mental illness if he is not treated he poses a danger to himself or others; and, he still suffers from a severe and abnormal mental, emotional or physical distress, and without continued treatment he will experience substantial mental or physical deterioration to function.[3] All parties and experts agree that Harrison should be under court ordered extended mental health services. The only question raised by Harrison is whether there is legally or factually sufficient evidence to continue his inpatient commitment. Under former Texas Code of Criminal Procedure article 46.03 and the applicable Health Code provisions, the trial court is granted authority to order

---

[3]*See* Act of April 29, 1991, 72nd Leg., R.S., ch. 76, § 1, 1991 Tex. Gen. Laws 515, 589 (amended 1995, 1997, 1999, 2003, 2011) (current version at Tex. Health & Safety Code Ann. § 574.035 (West Supp. 2014)); Act of April 29, 1991, 72nd Leg., R.S., ch. 76, § 1, Sec. 574.036 (a)-(e), 1991 Tex. Gen. Laws 515, 590 (amended 1997) (current version at Tex. Health & Safety Code Ann. § 574.036 (West 2010)). The trial court's findings in the present case were expressly "pursuant to the provisions of Article 46.03, Texas Code of Criminal Procedure" and the Texas Mental Health Code.

1

Harrison to be committed for another year to inpatient care. *See* Act of May 25, 1983, 68th Leg., R.S., ch. 454, § 4(d)(5), 1983 Tex. Gen. Laws 2640, 2645 (repealed 2005) (current version at Tex. Code Crim. Proc. Ann. art. 46C.261(h) (West 2006)); Act of April 29, 1991, 72nd Leg., R.S., ch. 76, § 1, 1991 Tex. Gen. Laws 515, 589 (amended 1995, 1997, 1999, 2003, 2011) (current version at Tex. Health & Safety Code Ann. § 574.035 (West Supp. 2014)); Act of April 29, 1991, 72nd Leg., R.S., ch. 76, § 1, Sec. 574.036 (a)-(e), 1991 Tex. Gen. Laws 515, 590 (amended 1997) (current version at Tex. Health & Safety Code Ann. § 574.036 (West 2010)).[4]

## THE TRIAL COURT PROPERLY EXERCISED ITS AUTHORITY

Harrison's challenge on appeal goes directly to the decision of the trial court to order inpatient as compared to outpatient care, and not to whether Harrison meets the criteria for continued court ordered extended mental health services. The trial court's decision to return Harrison to inpatient care and its finding regarding the inappropriateness of Modest Family Care or other outpatient care was within the trial court's sound discretion. *See* Act of April 29, 1991, 72nd Leg., R.S., ch.

---

[4]Based on Harrison's offense date of February 1, 1994, this Court has previously held that Mental Health Code sections 574.035(a) and 574.036(a)-(e), in effect at the time of Harrison's offense, are applicable to his recommitment hearing under former article 46.03 of the Code of Criminal Procedure. *See Harrison v. State*, 259 S.W.3d 314, 315-17 (Tex. App.—Beaumont 2008, no pet.).

76, § 1, Sec. 574.036 (a)-(e), 1991 Tex. Gen. Laws 515, 590 (amended 1997) (current version at Tex. Health & Safety Code Ann. § 574.036 (West 2010)); *Campbell v. State*, 118 S.W.3d 788, 803-04 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (trial court has discretion to choose between either inpatient or outpatient treatment); *Harrison v. State*, No. 07-99-0259-CR, 1999 Tex. App. LEXIS 8332, *18-19 (Tex. App.—Amarillo Nov. 2, 1999, no pet.) (not designated for publication); *Niswanger v. State*, 875 S.W.2d 796, 802 (Tex. App.—Waco 1994, no pet.) (reviewing under abuse of discretion standard the trial court's conclusion that the least restrictive appropriate setting for patient was the state hospital); *Sims v. State*, 816 S.W.2d 502, 508 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (trial court ordered extended mental health commitment of patient found incompetent to stand trial for attempted murder and the court of appeals applied abuse of discretion standard in reviewing the trial court's decision on the most appropriate treatment alternative); *see also Harrison v. State*, 148 S.W.3d 678, 689-92 (Tex. App.—Beaumont 2004, no pet.) (Gaultney, J., dissenting) ("committing court charged with the statutory responsibility for the supervision is entitled to deference in making that discretionary judgment [whether inpatient or outpatient supervision is appropriate].").

To determine that the trial court abused its discretion requires more than an error in judgment; it must amount to an arbitrary and unreasonable action by the trial court. *Sims*, 816 S.W.2d at 508. We must view the evidence in a light that is most favorable to the action of the trial court. *Id*.

After reviewing the record and the testimony of Dr. Roberts, as summarized below, and viewing the evidence in a light most favorable to the findings of the trial court, and applying an abuse of discretion standard of review, I conclude that the trial court did not err in returning him to inpatient supervision. *Harrison v. State*, 259 S.W.3d 314 (Tex. App.—Beaumont 2008, no pet.).

Under former article 46.03, § 4(d)(5) of the Texas Code of Criminal Procedure, which is applicable to this case by virtue of the date of the underlying offense,[5] the trial court is granted the task and authority to decide whether the patient continues to meet the criteria for "involuntary commitment" and whether "care or treatment on an out-patient basis as provided in Subdivision (4)" is appropriate. Furthermore, "[i]f the court determines that the acquitted person continues to meet the criteria for involuntary commitment and that out-patient supervision is not appropriate, the court *shall* order that the person be returned to a

---

[5]Under the current version of the Code of Criminal Procedure, the language referencing the Texas Mental Health Code has been deleted from the statute which governs recommitment hearings of persons found not guilty by reason of insanity.

4

mental hospital or other appropriate in-patient or residential facility." *See* Act of May 25, 1983, 68th Leg., R.S., ch. 454, § 4(d)(5), 1983 Tex. Gen. Laws 2640, 2645 (repealed 2005) (current version at Tex. Code Crim. Proc. Ann. art. 46C.261(h) (West 2006)) (emphasis added). Accordingly, we should affirm the trial court's ruling returning Harrison to court-ordered inpatient care and finding outpatient supervision is not appropriate unless it was an abuse of discretion for the trial court to order Harrison to be returned to inpatient care.[6]

None of the experts who testified at the hearing recommend releasing Harrison from court ordered extended mental health supervision and services; rather, they simply disagree on whether he should receive services in an outpatient setting as compared to an inpatient setting. All of the experts argue that Harrison continues to need court ordered involuntary supervision and care. The trial court could reasonably have concluded based upon the testimony from Dr. Roberts, the records from the other proceedings, Harrison's own testimony, as well as the

---

[6]Furthermore, under section 574.036 of the Texas Health and Safety Code, as currently worded or as worded at the time of the underlying offense, the trial court is granted authority to decide whether inpatient or outpatient care is appropriate. *See* Act of April 29, 1991, 72nd Leg., R.S., ch. 76, § 1, Sec. 574.036 (a)-(e), 1991 Tex. Gen. Laws 515, 590 (amended 1997) (current version at Tex. Health & Safety Code Ann. § 574.036 (West 2010)); *see also Campbell v. State*, 118 S.W.3d 788, 803-04 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Sims v. State*, 816 S.W.2d 502, 508 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

testimony regarding the deficiencies with outpatient care, that Harrison should be returned to an inpatient care facility. Therefore, the trial court did not abuse its discretion in finding outpatient supervision is not appropriate and in returning Harrison to inpatient care.

## LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS THE TRIAL COURT'S ORDER

In addition to the foregoing, even under a legal and factual sufficiency review, and pursuant to the statutory authority cited in the majority, I would conclude that the evidence in the record before us is sufficient to support the findings made by the trial court. The record before the trial court contains testimony from a "battle of experts,"[7] and as the trier of fact in the recommitment hearing, the trial court could reasonably resolve the disputed evidence and the different expert opinions in favor of its findings. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). A reviewing court should avoid supplanting its own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

When evaluating the evidence for legal sufficiency, the reviewing court must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *State v. K.E.W.,* 315 S.W.3d 16,

---

[7]This phrase is used to represent a reference to the differences of opinions offered by the parties' experts. *See, e.g., House v. State*, 261 S.W.3d 244, 247 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

20 (Tex. 2010). There is no requirement that the evidence must be undisputed or unequivocal. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979). We consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *K.E.W.*, 315 S.W.2d at 20. The factfinder, not this Court, is the sole judge of the credibility and demeanor of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. The proper inquiry is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations and whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding; the reviewing court must detail in its opinion why it has concluded that a reasonable factfinder could not have credited the disputed evidence in favor of the finding. *Id*.

In reaching its conclusion, the majority appears to be focusing upon the snapshot of a single year in Harrison's life and with his compliance in taking his psychiatric medication during that time frame (i.e., while he has been in a controlled inpatient setting), rather than considering the broader scope of evidence

that was in the record before the trial court at the time it made its findings. The trial court had before it the contradictory testimony from competing experts, one of whom testified that Harrison should not be released into outpatient care and that he should remain in the inpatient setting, as well as records regarding the history of Harrison's underlying mental illness and the consequences of his failure to take his medication,[8] the testimony from the prior hearings,[9] and the testimony from

---

[8]While he was off his medications, Harrison killed his mother, strangling her, and mutilating her body by cutting off her head, cutting out her heart, and cutting out her eyes. *See Harrison v. State*, 09-98-134-CR, 1999 Tex. App. LEXIS 2027, **3-4 (Tex. App.—Beaumont March 24, 1999, no pet.) (not designated for publication). In 1994, a jury found Harrison "not guilty by reason of insanity." *Harrison v. State*, 148 S.W.3d 678, 679, 685 (Tex. App.—Beaumont 2004, no pet.). The jury also determined that Harrison is "mentally ill, and . . . likely to cause serious harm to himself; is likely to cause harm to others; or will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress and will continue to experience deterioration of his ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment[.]"

[9]Harrison waived his right to a jury trial in the recommitment proceeding. At the hearing, the trial court took judicial notice of all of the prior commitment proceedings and the records relating thereto. The prior proceedings include the following: *Harrison v. State*, No. 09-13-00069-CV, 2013 Tex. App. LEXIS 11406 (Tex. App.—Beaumont Sept. 5, 2013, pet. denied); *Harrison v. State*, No. 09-10-00017-CV, 2010 Tex. App. LEXIS 5343 (Tex. App.—Beaumont July 8, 2010, pet. denied); *Harrison v. State*, 259 S.W.3d 314 (Tex. App.—Beaumont 2008, no pet.); *Harrison v. State*, 239 S.W.3d 368 (Tex. App.—Beaumont 2007, no pet.); *Harrison v. State*, 179 S.W.3d 629 (Tex. App.—Beaumont 2005, pet. denied); *Harrison*, 148 S.W.3d 678; *Harrison v. State*, No. 07-99-0259-CR, 1999 Tex. App. LEXIS 8332 (Tex. App.—Amarillo Nov. 2, 1999, no pet.) (not designated for publication); *Harrison*, 1999 Tex. App. LEXIS 2027.

Harrison. When viewed in the light most favorable to the trial court's findings, as required, the evidence is legally and factually sufficient to support the findings of the trial court. *See id.* That is, there is legally and factually sufficient evidence on which a reasonable trier of fact could have formed a firm belief or conviction that as a result of his mental illness, without continued court ordered care, there is a likelihood and continued risk that Harrison will cause serious harm to others. Furthermore, recent objectively observable actions of Harrison, as acknowledged in Dr. Roberts's testimony, tend to confirm such a finding. *See K.E.W., 315 S.W.3d at 25-26.*

The trial court was entitled to consider all of the evidence before it in determining whether Harrison, a person acquitted by reason of insanity and committed to a mental facility, continues to meet the criteria for continued inpatient commitment. When making a decision at the annual review for recommitment, the reviewing court and experts are not limited to consideration of only those events or evidence from the prior year. "The state of an individual's emotional and psychological well-being--or lack thereof--and whether the person should remain committed because of a mental illness, requires more than a snapshot of a single year in a person's life; it is a broad inquiry." *Campbell*, 118 S.W.3d at 796.

Dr. Roberts testified that Harrison has a history of stable periods followed by unstable periods and that Harrison requires inpatient rather than outpatient treatment for his illness. Dr. Roberts's opinion regarding the need for inpatient care differed from the opinions voiced by Dr. Howland and from the contents of the report of Dr. Gripon. Dr. Roberts's opinions regarding Harrison have not changed from the prior year.[10] According to Dr. Roberts, Harrison does not have sufficient insight into his mental illness,[11] has a history of wanting to control his treatment plan, and "has shown the ability to mask or cover his delusions [as] noted by his psychiatrists at Vernon and at Rusk over the years." Dr. Roberts testified that although Harrison has regularly taken his psychiatric medication over the past year, according to Harrison's records, Harrison had recently exhibited aggressive behavior toward other inmates and the nursing staff,[12] recently refused to take other medications, still shows symptoms that he suffers from delusional thoughts and that he is trying to control his treatment plan, and in the past has shown periods

---

[10]*See Harrison*, 2013 Tex. App. LEXIS 11406, at **5-9.

[11]Harrison's continued belief that his mental illness originated from something other than natural progression was an example of a lack of insight into his mental illness.

[12]In the prior year, Harrison complained about a nurse tampering with his medications, he had arguments with staff and another patient, and Roberts testified Harrison "displayed aggressive behavior," and he refused to take his prescribed medications for the flu and pneumonia, as well as questioned taking a prescribed antibiotic.

10

of good behavior followed by bad behavior. Furthermore, Dr. Roberts noted that it is the "staff members in the hospital, training programs, and classes" that allow Harrison to recognize his psychosis, and when he "is getting this information consistently and persistently from the staff at the hospital, he's able to control it better[.]" Dr. Roberts concluded that Harrison should continue inpatient treatment at Rusk State Hospital for the next twelve months, and that an outpatient setting is not sufficient to provide the level of input, care, and treatment that Harrison needs.

The majority notes that Harrison's recent refusal to take his medications did not involve his refusal to take his psychiatric medication but involved other medications prescribed by a physician for other conditions. However, it is not necessarily "what medication he refused" but the fact he refused to take prescribed medications that Dr. Roberts found to be significant. *See generally House v. State*, 261 S.W.3d 244, 252 n.4 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (patient's refusal to take prescribed medication and not "what medication he refused" can be an important factor). The trial court, as the factfinder, had the benefit of observing and evaluating the credibility of the witnesses, and determining how much weight to give their testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex. 2005). The trial court could believe one witness over another, and we may not substitute our judgment for that of the trial court. *Golden*

*Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).[13] Accordingly, the trial court could have accepted the testimony of Dr. Roberts.

The trial court also heard Harrison's testimony and could have reasonably concluded that his testimony was consistent with the testimony voiced by Dr. Roberts that Harrison lacked insight into his condition, that he continued to exhibit recent overt acts or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to others, and further that he should not be placed in the proposed outpatient setting. For example, Harrison testified that Ambien caused him to hear voices telling him to kill his mother because she "was of the devil." He testified that prior to taking the Ambien he never heard voices. Harrison also testified that his illness was possibly caused by his coworkers who he believes poisoned his coffee. When questioned about the answers he gave in his 2011 recommitment hearing, Harrison denied that the transcript was accurate. Harrison also testified that he did not allow Dr. Roberts to interview him for this hearing and that Roberts lied about what Harrison told Dr. Roberts in the 2013 interview.

---

[13]Although Dr. Roberts last interviewed Harrison prior to the previous annual review in 2013, the trial court could also have considered the fact that Harrison would not submit to another pre-hearing exam as significant. For example, a reasonable inference from his refusal to submit to an examination by Dr. Roberts might be that Harrison still believed that he was attempting to control or manipulate his treatment, or that his refusal hampered Dr. Roberts's ability to obtain additional information by interviewing Harrison prior to the hearing.

In addition to the foregoing, there was evidence in the record indicating that the proposed outpatient facility, Modest Family Care, is not equipped to provide the mental health services that Harrison needs. The evidence presented at the hearing established that he would be living with other residents in the home, and that the home is located in a residential neighborhood. Harrison's counselor indicated Modest Family Care is not a highly sought-after facility and not at the top of his list of places to send people. According to the counselor, Modest Family Care may not even be a licensed group home. Modest Family Care has no psychiatric nurse on staff to ensure Harrison takes his medications or to monitor his daily behavior for signs or symptoms that his mental illness or condition has diminished, that his medication is not working, or other symptoms that may indicate he is in need of further intervention.

On the record before it, the trial court could have formed a firm belief or conviction that the Modest Family Care facility would not provide adequate supervision for Harrison, that outpatient supervision is not appropriate, that "no sufficient settings for care on an out-patient basis exists at the present time,"[14] that Harrison "continues to meet the criteria for involuntary inpatient commitment,"

---

[14]"Texas law does not require that the committing court allow inadequate outpatient supervision of a violently insane acquittee." *Harrison*, 148 S.W.3d at 692 (Gaultney, J., dissenting).

and that he should be returned to a mental hospital or other appropriate inpatient facility.

Therefore, I would overrule both of Harrison's issues and affirm the order of the trial court.

_____
LEANNE JOHNSON
Justice

Dissent Delivered
October 30, 2014